UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RASHARD BROWN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-11117-ADB |
| | * | |
| DEPARTMENT OF CORRECTIONS, | * | |
| THOMAS A. TURCO, III., STEVEN | * | |
| SILVA, KEITH NANO, SAMUEL | * | |
| RAMOS, and JOHN DOES 1–10, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Rashard Brown ("Brown"), who is incarcerated, brought this action against the Massachusetts Department of Corrections, Thomas A. Turco ("Turco"), Steven Silva ("Silva"), Keith Nano ("Nano"), and Samuel Ramos ("Ramos" and collectively, "Defendants") for violation of his civil rights, retaliation, and common law torts. See generally [ECF No. 1 ("Complaint" or "Compl.")]. Before the Court is Defendants' motion to dismiss. [ECF No. 34]. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

### A.   Factual Background

The following factual allegations are taken as true only for purposes of the motion to dismiss. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019) (stating that on a motion to dismiss, all well-pled facts in the complaint are assumed to be true).

## 1.    The Parties

Brown is a Black individual who is incarcerated at MCI-Norfolk in Norfolk, MA. [Compl. ¶¶ 1, 26].

Turco is the former Department of Corrections ("DOC") Commissioner who authorized a tactical team to execute a no-knock cell entry, which resulted in injuries to Brown.  [Compl. ¶ 3]. Silva is the "former Superintendent of Souza Baranowski Correctional Center (['SBCC'])," Nano is the former "Deputy of Operations of SBCC," and Ramos is a Captain of SBCC.  [Id. ¶¶ 6–7, 10].  Silva, Nano, and Ramos were "responsible for the care and custody of" Brown. [Id.].[1]  All of these Defendants are sued in their official and individual capacities.  [Id. ¶¶ 3, 6–7, 10].

## 2.    The Staff Assault and Response

On August 20, 2018, a staff assault occurred in one of SBCC's two housing units, called the green side unit (the "Staff Assault").  [Compl. ¶ 17].  The two housing units do not "interact[]" for security reasons, with two exceptions.  [Id. ¶¶ 18–19].  The two exceptions are the "L–2 working unit and H–2 lifer's unit," which are "considered privilege units where men demonstrating good behaviors and work ethics are placed."  [Id. ¶ 19].  Plaintiff was a member

---

[1] Brown also brings claims against the DOC and several unidentified John Doe Defendants in their individual and official capacities.  [Compl. ¶ 4 (former Deputy Commissioner of Re-Entry and Classification responsible for Brown's care and custody); id. ¶ 5 (former Deputy Commissioner of Operations responsible for Brown's care and custody); id. ¶ 8 (former Deputy Superintendent of Classification and Re-Entry responsible for Brown's care and custody); id. ¶ 9 (former Director of Security of SBCC responsible for Brown's care and custody and "enforcement of all related force policies and regulations"); id. ¶¶ 11–16 (six tactical move team members responsible for Brown's care and custody and enforcement of all force policies and procedures (the "Six Move Team Members"))].

of the L-2 work unit because he had not "been into any trouble nor had [he] incurred any disciplinary action over a year." [Id. ¶ 24].

On August 21, 2018, Silva, Nano and the Deputy Superintendent of Classification and Reentry "coordinated a[n] institutional search of the prison with [] Turco," the Deputy Commissioner of Operations and the Deputy Commissioner of Classification and Reentry. [Compl. ¶ 20]. Apparently as part of that search, Turco authorized Ramos and the Six Move Team Members "to conduct []no knock cell entry into targeted inmate's cell[s]." [Id. ¶ 21]. These "inmates were Black inmates that had been identified as Security Threat Group [('STG')] members." [Id.].

With a no-knock cell entry, a move team is authorized "to open the cell door without placing an inmate in restraints first[,]" and then they "run into the cell with a shield charging at the inmate barking orders simultaneously." [Compl. ¶ 22]. The tactic "create[s] a heighten[ed] chance of inmate assault b[ecause they are] surprised by officers and believ[e] an assault on his person [is] occurring." [Id.].

In this particular circumstance, Brown alleges that "Turco's authorization of the '[n]o knock cell entry' after [the] [S]taff [A]ssault was an exercise of poor judgment" because "officers serving on the move team would be emotionally charged" as a result of the Staff Assault. [Compl. ¶ 23]. Turco was accordingly "incit[ing] a situation in which inmates would be taught a punitive lesson by a staff assault." [Id.].

With respect to Brown, Silva, Nano, and the Deputy Superintendent of Classification and Reentry all knew that he was "no[t] part of the [STG] responsible for the [S]taff [A]ssault." [Compl. ¶ 24]. They nevertheless included him on their "hit list and forwarded it to Defendant Turco." [Id. ¶ 25].

3

### 3.      The No-Knock Entry of Brown's Cell and His Interview

After being authorized to conduct no-knock entries, Ramos and the Six Move Team

Members breached Brown's cell "based on him being a [B]lack STG inmate unrelated to the

August 20, 2018 incident."  [Compl. ¶ 26].  Although he "attempted to comply with directives of

getting on the ground," the Six Move Team Members "tackled him to the floor, hitting his head

on the bedframe and placing a knee on his neck[,] obstructing his ability to breath."  [Id.].

Brown "kept saying that he was not resisting but force continued to be applied to g[et] him in

hand cuffs."  [Id.].  As a result of the force, "[h]is head was swollen and [he] almost lost

consciousness from being unable to breath from the knee of his neck causing emotional distress."

[Id. at 7, ¶ 37][2].

Brown was then handcuffed and brought into a holding area, where he was interviewed

by an officer.  [Compl. ¶ 27].  He was asked questions about the Staff Assault during his

interview, and he also asked the officer why force was used against him for something that

happened on the other side of the prison that "he had nothing to do with."  [Id.].  The officer

responded "that a message had to be sent to prevent future assaults against staff."  [Id.].

After the interview, Brown was "denied medical and mental health" treatment, "which is

normally a part of the procedures after force has been used against an inmate."  [Compl. ¶ 28].

Instead, he "was placed back into his cell."  [Id.].

---

[2] Beginning at page 6 of the Complaint, Plaintiff's Counts and paragraph numbers appear to be
out of order.  Accordingly, for pages 6–9 of the Complaint, the Court cites to both the page and
paragraph numbers.

### 4.      Brown's August 21, 2018 Grievance

On August 21, 2018, Brown "initiated a grievance against the Tactical Response Team members for excessive force in breach of [103 C.M.R. 505] and denial of medical treatment in violation of his 8th amendment right to the U.S. Constitution [(the "8/21/2018 Grievance")]." [Compl. ¶ 29].

The 8/21/2018 Grievance was submitted on August 22, 2018.  [ECF No. 1-2 at 1].  It states, among other things, that "tactical officers [a]ssaulted me when they entered my [] cell.  I was slammed to the ground & officer pinned me down putting the[ir] knee with full pressure on my neck & back.  Also hitting my head off bed frame.  I never received medical treatment or [was] see[n] by mental health."  [Id.].  It further says that Brown "[r]equested to see medical & filed an informal & sick slip."  [Id.].  On September 4, 2018, prison staff signed the grievance and despite there being a section where staff could note the "Decision" reached, they left that section blank and wrote that the "matter ha[d] been referred to the Superintendent's office for intake."  [Id.].

On October 19, 2018, Christopher Weagle of the Internal Affairs Unit ("IAU") submitted an inquiry report regarding the "Informal Grievance."  [ECF No. 1-2 at 3].  Among other things, Weagle writes that he reviewed a "hand-held video . . . , which also includes sound," in which "the camera staff member record[s] the date, time, and location at SBCC as well as the target . . . cell . . . which houses Brown."  [Id. at 4].  In the video, he writes, "the cell door is breached and several orders are given to 'get on the ground.'"  [Id.].  He further notes that, per the video, Brown says "I didn't even do nothing" and "I'm not even resisting," among other things.  [Id.].  Weagle writes that Brown was then escorted from the cell to a no-contact visiting area, where his restraints were removed and he was searched.  [Id.].  The video ends at this time.  [Id.].

5

Weagle then states that he interviewed Ramos, who said that "there had been a serious assault on staff that precipitated the [Tactical Response Team] being activated," and that "'[n]o [k]nock' cell entries were being conducted due to inmates possibly being in possession of weapons, drugs, and other contraband." [ECF No. 1-2 at 7]. Ramos also said that "he had been given orders to conduct a '[n]o [k]nock' entry of Brown's cell." [Id.].

Ramos told Weagle that Brown "appeared . . . compliant with getting down on the floor," and he "denied observing any of his staff members having to utilize force" or "observing Brown strike any parts of his body off objects in the cell, . . . includ[ing] striking his head off the bedframe." [ECF No. 1-2 at 7]. Ramos also "denied observing staff having to utilize any force to keep Brown on the floor and said Brown remained compliant throughout the incident." [Id. at 8]. He said "it was possible a staff member's knee may have been near Brown's head; however, Brown made no allegations he was being assaulted by staff." [Id.]. Finally, Ramos stated that "Brown was not afforded medical attention or to speak with mental health at the time as a use of force had not occurred." [Id.].

Weagle ultimately found "by a preponderance of the evidence" that "there is no merit to Brown's allegations," and thus "further investigation by the IAU [wa]s not warranted at th[e] time." [ECF No. 1-2 at 8–9].

### 5.    Retaliation for the 8/21/2018 Grievance

On August 24, 2018, three days after Brown filed the 8/21/2018 Grievance, he was handcuffed "by two officers and escorted to a []waiting van with other Black suspected STG inmates to segregation units." [Compl. ¶ 30]. He was then "placed in Norfolk prison [MCI-Norfolk] pending an out of state transfer in retaliation for griev[ing]" the no-knock entry of his cell and resulting injury. [Id.].

6

Turco, Silva, Nano, and the Deputy Superintendent of Classification coordinated the transfer. [Compl. ¶ 31]. Brown alleges that they also "began to manipulate [his] recent institutional history as justification to characterize him as a present threat warranting transfer in retaliation for" the 8/21/2018 Grievance. [Id.]. That is despite the fact that they "knew that [he] had not incurred a disciplinary infraction in two years, was housed in a privileged L–2 unit[,] . . . and [was] employed as a gym runner." [Id. ¶ 32]. Brown ultimately spent 11 months in segregation at MCI-Norfolk, during which "he was severely restricted to [twenty-three] hours segregation, limited property, no ability to purchase canteen, phone twice a week, and a[n] hour [of] recreation in a cage. He also suffer[ed] emotional distress." [Id. at 6, ¶ 40].

Accordingly, on August 29, 2018, Brown filed an additional "grievance directly to Defendant Turco's office regarding the retaliation against him fror [sic] exercising his grievance rights." [Compl. ¶ 32]. It states, among other things, that Brown "was assaulted by staff members in SBCC 8/21/18. Never seen [by] medical or mental health. Wasn't sent to the SMU. I was taken out of population . . . for no reason. Me being held in Norfolk SMU is illegal . . . ." [ECF No. 1-2 at 2]. On September 4, 2019, the "Decision" on the grievance was "N/A," and the accompanying "comment" states "SMU placement due to pending investigation by SBCC." [Id.].

### B.    Procedural History

Brown filed the Complaint on July 6, 2021, bringing claims for violation of civil rights under 42 U.S.C. § 1983 based on use of excessive force (Count I), [Compl. at 7, ¶¶ 34–37];[3] civil

---

[3] As referenced above, the Counts in Brown's Complaint appear out of order, and Counts II and III appear above the "Causes of Action" header. See [Compl. at 6–7]. The Court lists the Counts here in numerical order and assumes that Counts II and III are meant to be stated as causes of action.

rights retaliation under 42 U.S.C. § 1983 (Count II), [id. at 6, ¶¶ 38–40]; civil rights violation

under Mass. Gen. Laws ch. 12, §§ 11I, 11H (Count III), [id. at 6, 8, ¶¶ 41–43]; assault and

battery under Massachusetts law (Count IV), [id. at 8, ¶¶ 44–45]; intentional infliction of

emotional distress under Massachusetts law (Count V), [id. at 8–9, ¶¶ 46–48]; and "municipal

liability violation pursuant to 42 U.S.C. § 1983" (Count VI), [id. at 9, ¶¶ 49–50].  Defendants

moved to dismiss all Counts on October 4, 2023, [ECF No. 34], and Brown opposed on January

11, 2024, [ECF Nos. 45, 46].

## II.    LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pled

facts as true, analyze those facts in the light most favorable to the plaintiff, and draw all

reasonable factual inferences in favor of the plaintiff.  See Gilbert, 915 F.3d at 76, 80.

"[D]etailed factual allegations" are not required, but the complaint must set forth "more than

labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must

contain "factual allegations, either direct or inferential, respecting each material element

necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513

F.3d 301, 305 (1st Cir. 2008) (internal quotations omitted) (quoting Centro Médico del Turabo,

Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient

to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give

rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–

45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of

plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).

In addition, in this case, the Court construes the complaint liberally because it was filed pro se. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). "However, pro se status does not insulate a party from complying with procedural and substantive law." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997). Dismissal of a pro se complaint is appropriate when the complaint fails to state an actionable claim. Muller v. Bedford VA Admin. Hosp., No. 11-cv-10510, 2013 WL 702766, at *3 (D. Mass. Feb. 25, 2013) (citing Overton v. Torruella, 183 F. Supp. 2d 295, 303 (D. Mass. 2001)).

## III.      DISCUSSION

### A.      Excessive Force and Denial of Medical Care (Count I)

Count I alleges a violation of Brown's Eighth Amendment rights based on the use of excessive force and the denial of medical care under 42 U.S.C. § 1983. [Compl. at 7–8, ¶¶ 34–37].

The Eighth Amendment requires prison officials to "provide humane conditions of confinement[,] . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)).

"Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment. The Eighth Amendment is meant to prohibit 'unnecessary and wanton infliction of pain,' which is 'repugnant to the conscience of mankind.'" Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (en banc) (quoting Estelle v. Gamble, 429 U.S. 97, 103, 105–06 (1976)). That said, the Eighth Amendment "does not mandate comfortable prisons," but rather prohibits "inhumane ones." Abernathy v. Anderson, 984 F.3d 1, 6 (1st Cir. 2020) (first quoting (quoting Rhodes v. Chapman, 452 U.S. 337, 349

(1981); and then quoting <u>Farmer</u>, 511 U.S. at 832); <u>see also</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 8–9 (1992) ("[E]xtreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' . . . 'only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.'" (internal citation omitted) (first quoting <u>Rhodes</u>, 452 U.S. at 347; and then quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991))).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect."  <u>Staples v. Gerry</u>, 923 F.3d 7, 13 (1st Cir. 2019) (quoting <u>Wright v. Goord</u>, 554 F.3d 255, 268 (2d Cir. 2009)).

## 1.      Excessive Force

With respect to the use of force, "[t]he objective component of an Eighth Amendment claim is . . . contextual and responsive to 'contemporary standards of decency.'"  <u>McMillian</u>, 503 U.S. at 8 (quoting <u>Estelle</u>, 429 U.S. at 103); <u>see also</u> <u>Staples</u>, 923 F.3d at 13 ("To prevail on the objective prong, [Brown] must show that 'the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.'" (quoting <u>McMillian</u>, 503 U.S. at 8 (quoting <u>Wilson</u>, 501 U.S. at 298))).  "In the excessive force context, . . . [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident."  <u>McMillian</u>, 503 U.S. at 9 (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 327 (1986)).

The subjective prong, on the other hand, "turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose

of causing harm.'"  Staples, 923 F.3d at 13 (quoting Whitley, 475 U.S. at 320–21).  Importantly,

"not . . . every malevolent touch by a prison guard gives rise to a federal cause of action,"

McMillian, 503 U.S. at 9, and "*de minimis* uses of physical force" are not prohibited, "provided

that the[y are] . . . not of a sort 'repugnant to the conscience of mankind,'" id. (quoting Whitley,

475 U.S. at 327).

      "The 'factors' that 'are relevant to that ultimate determination' include 'the extent of the

threat to the safety of staff and inmates, as reasonably perceived by the responsible officials,'

'the need for the application of force,' 'the relationship between the need and the amount of

force that was used,' 'the extent of the injury inflicted,' and 'any efforts made to temper the

severity of a forceful response.'"  Staples, 923 F.3d at 13 (quoting Whitley, 475 U.S. at 321).

      Defendants first argue that "[t]here is no basis to find an excessive use of force claim as

there was no use of force of any kind during the cell entry and extraction of Brown."  [ECF No.

35 at 6].  In support of this argument, Defendants aver that "the documentary evidence

. . . attached to the Complaint," namely Weagle's written description of the video of the incident

(the Court has not been provided with the video at this stage), does not describe the level of force

that Brown alleges.  [Id. at 8].  Rather, they contend that the video "corroborate[s] defendant

Ramos' account of what occurred," namely that "Brown was compliant . . . as no staff had to use

force to bring Brown to the floor or keep him on the floor," that he "did not observe Brown strike

his head on the bedframe," and that "Brown did not state that he was being assaulted . . . ."  [Id.].

Ramos did "admit[]," however, that "a staff member's knee may have been close to Brown's

head."  [Id.].

      In response, Brown argues that he was not involved in the Staff Assault, that force was

used against him to "send [the] SBCC general population a message that officer assaults won't

be tolerated," and that the force was unnecessary because he was complying with officer requests.  See [ECF No. 46 at 4–5].

At this stage, Defendants' reference to the "evidence," especially to a description of a video that the Court does not have before it, is misplaced, as the Court must accept all well-pled allegations as true, analyze the facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert, 915 F.3d at 76, 80.  With that standard in mind, Brown alleges that Ramos and the Six Move Team Members, with Turco's authorization, executed a no-knock entry into Brown's cell to "t[each] a punitive lesson" after the Staff Assault, [Compl. ¶ 23], which Brown was not involved in, [id. ¶¶ 24, 26].  They then proceeded to "tackle[] him to the floor, [he] hit[] his head on the bedframe[,] and [they] plac[ed] a knee on his neck obstructing his ability to breath."  [Id. ¶ 26].  As a result, "[h]is head was swollen and [he] almost lost consciousness from being unable to breath from the knee of his neck causing emotional distress."  [Id. at 7, ¶ 37].  In sum, Brown plausibly alleges that Ramos and the Six Move Team Members used substantial force on him to teach a lesson for an event that he was not involved in, resulting in injury.  This is enough to survive a motion to dismiss.  See McMillian, 503 U.S. at 9; Staples, 923 F.3d at 13.

Second, Defendants argue that "[e]ven if the Court were to find that a use of force did occur, de minimis use of force falls outside the scope of the Eighth Amendment," [ECF No. 35 at 9], and the "alleged injuries simply do not meet the level of injury required to effect an Eighth Amendment violation," [id. at 10].

"Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts.  An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."

12

Wilkins v. Gaddy, 559 U.S. 34, 38 (2010); see also McMillian, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.  This is true whether or not significant injury is evident." (internal citation omitted)).  Here, Brown sufficiently alleges that he was gratuitously beaten, see, e.g., [Compl. ¶¶ 23–24, 26], and that he suffered injuries as a result, [id. at 7, ¶ 37].  That is sufficient to state a claim of excessive force.  See McMillian, 503 U.S. at 9; Staples, 923 F.3d at 13.

### 2.      Denial of Medical Care

Count I also alleges that Brown was denied medical care in violation of his Eight Amendment rights.  [Compl. at 7, ¶ 36].

Like a claim for excessive force, an Eighth Amendment claim for inadequate medical care consists of subjective and objective components.  See Kosilek, 774 F.3d at 82.  As to the objective component, a plaintiff must plead facts, which, if true, show "a serious medical need for which [the plaintiff] has received inadequate treatment."  Id. at 85.  For purposes of the Eighth Amendment, a medical need is "serious" if it has "been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Id. at 82 (quoting Gaudreault v. Mun. of Salem, 923 F.2d 203, 208 (1st Cir. 1990)).  The objective prong does not "impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing."  Id.

The subjective component requires factual allegations supporting an inference of "deliberate indifference" by the defendant.  Kosilek, 774 F.3d at 83 (citing Estelle, 429 U.S. at 105–06).  Deliberate indifference refers to "a narrow band of conduct."  Id. (quoting Feeney v. Corr. Med. Servs. Inc., 464 F.3d 158, 162 (1st Cir. 2006)).  Demonstrating deliberate indifference requires allegations that support the conclusion "that the absence or inadequacy of

treatment is intentional" rather than simply inadvertent.  Perry v. Roy, 782 F.3d 73, 79 (1st Cir.

2015).  "The obvious case [of deliberate indifference] would be a denial of needed medical

treatment in order to punish the inmate."  Kosilek, 774 F.3d at 83 (quoting Watson v. Caton, 984

F.2d 537, 540 (1st Cir. 1993)).  "But deliberate indifference may also reside in 'wanton'

decisions to deny or delay care where the action is recklessness, 'not in the tort law sense but in

the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm,

easily preventable.'"  Watson, 984 F.2d at 540 (internal citation omitted) (first quoting Wilson,

501 U.S. at 302 (1991); and then quoting DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)).

Plaintiff alleges that during the no-knock entry, Defendants "tackled him to the floor, [he]

hit[] his head on the bedframe and [someone then] plac[ed] a knee on his neck obstructing his

ability to breath."  [Compl. ¶ 26].  As a result, "[h]is head was swollen and [he] almost lost

consciousness from being unable to breath from the knee of his neck causing emotional distress."

[Id. at 7, ¶ 37].  After he was interviewed, Brown was "denied medical and mental health"

treatment "which is normally a part of the procedures after force" has been used.  [Compl. ¶ 28].

Instead, he "was placed back into his cell."  [Id.].

Defendants argue, contrary to the allegations that the Court must accept as true, that

Brown "was not seen by medical or mental health staff because staff did not have to use any

force on him so there was no need for medical or mental health staff."  [ECF No. 35 at 8].  In

response, Plaintiff avers that excessive force was used, [ECF No. 46 at 4–5], and that the

"subsequent denial of medical/mental health care to be evaluated and to document his injuries

was purposeful despite Brown's request for medical attention," [id. at 5].

Brown's allegations are sufficient, at this stage, to infer that his injuries were "so obvious

that even a lay person would easily recognize the necessity for a doctor's attention," Kosilek,

774 F.3d at 82, and that the failure to provide care was intentional, <u>see</u> <u>Perry</u>, 782 F.3d at 79, as medical and mental health treatment was "normally a part of the procedures after force," but was not provided, <u>see</u> [Compl. ¶ 28].

Accordingly, Defendants' motion to dismiss Count I in its entirety is <u>DENIED</u>.

### 3.    Count I Against Turco, Silva, Nano, and Ramos

In addition to arguing that Count I fails in its entirety on the merits, Defendants contend that Count I should be dismissed as to Turco, Silva, Nano and Ramos because "Brown failed to allege any specific facts to suggest that [they] are personally liable . . . ." [ECF No. 35 at 15].

"[A] supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority." <u>Guadalupe-Báez v. Pesquera</u>, 819 F.3d 509, 515 (1st Cir. 2016).  Rather, a claim for supervisory liability under section 1983 "has two elements: first, the plaintiff must show that one of the supervisor's subordinates abridged the plaintiff's constitutional rights. . . . [And s]econd, the plaintiff must show that the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." <u>Id.</u> at 514–15 (quotations and alterations omitted).

Here, as discussed above, Brown has sufficiently alleged a constitutional violation. Accordingly, the Court considers whether Turco, Silva, Nano and/or Ramos' "action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." <u>Guadalupe-Báez</u>, 819 F.3d at 515 (quotation and alterations omitted).

Brown alleges that Silva, Nano and Turco "coordinated [the] institutional search of the prison." [Compl. ¶ 20]. Silva and Nano, for their part, knew that Brown was "no[t] part of the [STG] responsible for the [S]taff [A]ssault," [id. ¶ 24], but they nevertheless included him on their "hit list and forwarded it to Defendant Turco," [id. ¶ 25]. Then, Turco authorized Ramos and the Six Move Team Members "to conduct []no knock cell entry into targeted inmate's cell[s]," [id. ¶ 21], which they did, [id. ¶ 26]. He also alleges that "Turco's authorization of the '[n]o knock cell entry' after [the] [S]taff [A]ssault was an exercise of poor judgment" because "officers serving on the move team would be emotionally charged" after the Staff Assault. [Id. ¶ 23].

With respect to Turco, Defendants argue that his "decision to authorize a no knock cell search . . . cannot be considered a basis for an Eighth Amendment violation." [ECF No. 35 at 15]. More specifically, they aver that "Brown's supposition that given the previous staff assault, Turco knew that ordering the no knock cell entry would lead to excessive use of force is too tenuous to establish an Eighth Amendment violation." [Id. at 16]. In response, Brown avers that Turco approved the no-knock entry "as retribution for the prior officer assault," and that "[g]iven the highly charged circumstances, [he] disregarded a risk that was obvious to" Brown's safety. [ECF No. 46 at 6]. The Court finds that based on the facts discussed above, see infra, Brown has sufficiently pled, at this stage, that Turco's authorization under the circumstances was "encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference" of his Eighth Amendment Rights. Guadalupe-Báez, 819 F.3d at 514–15.

Regarding Silva, Nano, and Ramos, Defendants argue that there is "no allegation that they personally were involved in the alleged excessive use of force or supervised anyone in a manner that was deliberately indifferent to the risk that Brown's civil right would be violated

during the search of his cell." [ECF No. 35 at 16].  As to Ramos specifically, they contend that although "Ramos was present during the cell entry, . . . there is no allegation that he assaulted Brown personally or even witnessed an assault on Brown."  [Id.].  Brown does not directly respond to this argument.  See generally [ECF No. 46].

With respect to Ramos the Court finds that the allegations that he was ordered to conduct the no-knock entry and did so with the Six Move Team members, [Compl. ¶¶ 26; ECF No. 1-2 at 7], is sufficient to state a claim for supervisory liability, see Guadalupe-Báez, 819 F.3d at 514–15.

As to Silva and Nano, that they "coordinated [the] institutional search of the prison," [Compl. ¶ 20], and included Brown on the list of STG members "and forwarded it to Defendant Turco," [id. ¶ 25], is not sufficient for the Court to find that they had any role in authorizing the entry of Brown's cell, and the manner of doing so.  Thus, the facts, as alleged, do not support a finding or inference that they encouraged, condoned, acquiesced to, or were grossly negligent in connection with the no-knock entry of Brown's cell.  See Guadalupe-Báez, 819 F.3d at 514–15.  Accordingly, the motion to dismiss Count I is GRANTED insofar as the Complaint is dismissed without prejudice as to Silva and Nano.[4]

---

[4] Defendants separately argue that all counts against Nano should be dismissed because he was not the Deputy Superintendent at SBCC on August 21, 2018.  [ECF No. 35 at 18–19 (citing Affidavit of Patricia Snow at [ECF No. 35-1])].  Even if the Court could consider the Snow affidavit, Plaintiff has specifically alleged Nano's involvement in the conduct at issue, see [Compl. ¶¶ 20, 24, 31], and thus the Court cannot assume that Defendant is correct that "Nano could not have done what Brown alleges" simply because he was not the Deputy Superintendent at the time of the alleged conduct, [ECF No. 35 at 18–19].  It is plausible, for example, that Nano may have been consulted and thus participated in the events at issue from his new job (apparently still within the Massachusetts correctional system, see [ECF No. 35-1 ¶¶ 9–13]).  To the extent that discovery shows that Brown's allegations against Nano are based solely on Nano's prior position at SBCC, and that he therefore had no involvement in the conduct at issue,

### B.      Retaliation (Count II)

Count II alleges a violation of civil rights due to retaliation under 42 U.S.C. § 1983.

[Compl. at 6, ¶¶ 38–40].  Specifically, Brown alleges that Defendants improperly retaliated by

removing him from SBCC and housing him in restrictive conditions because he filed the

8/21/2018 Grievance, in violation of his First Amendment Rights and Mass. Gen. Laws ch. 127,

§ 32.  See [id.].

"Running a prison system is a difficult enterprise, fraught with security concerns.  Given

that reality, courts must defer broadly to correctional officials' managerial decisions."  Hannon v.

Beard, 645 F.3d 45, 48 (1st Cir. 2011) (citing Turner v. Safley, 482 U.S. 78, 84–85 (1987)).

"This dynamic calls for a delicate balance between the flexibility needed to operate prisons and

the constitutional rights that prisoners retain.  In constructing that balance, courts have held that,

despite the deference owing to the decisions of prison officials, retaliation against a prisoner's

exercise of constitutional rights is actionable."  Id. (first citing Espinal v. Goord, 558 F.3d 119,

128 (2d Cir. 2009); then citing Allah v. Seiverling, 229 F.3d 220, 224–25 (3d Cir. 2000); and

then citing Thaddeus–X v. Blatter, 175 F.3d 378, 386 (6th Cir. 1999) (en banc)).

"Because prisoner retaliation claims are 'easily fabricated[ ] and . . . pose a substantial

risk of unwarranted judicial intrusion into matters of general prison administration,' courts must

insist that such claims are bound up in facts, not in the gossamer strands of speculation and

surmise."  Hannon, 645 F.3d at 48 (alterations in original) (quoting Bennett v. Goord, 343 F.3d

133, 137 (2d Cir. 2003)).  Accordingly, to state a claim for retaliation, Brown must sufficiently

---

the Court would likely closely scrutinize any remaining claims against him at the summary
judgment stage.

allege that "he engaged in a protected activity, that the state took an adverse action against him, and that there is a causal link between the former and the latter."  Id.

Filing a grievance, like Brown did, see, e.g., [Compl. ¶ 29], is "plainly" a "protected activity," Hannon, 645 F.3d at 48.  In addition, transfer to a more restrictive prison setting is an adverse action.  See id. at 49.  Accordingly, the Court must next determine whether Brown has sufficiently alleged a causal link between filing the 8/21/2018 Grievance and his transfer from SBCC to a more restrictive setting.  See id.

Defendants argue that "Plaintiff's conclusory allegations that he was placed in segregation and reviewed for out of state placement as retaliation is not supported by specific facts," [ECF No. 35 at 12], and that he was transferred for a different, legitimate reason, [id. at 13].  Specifically, they point to "a letter written by the Deputy Superintendent of Reentry at MCI CJ, [which] clearly outlines the reasons for Brown's continued placement in restrictive housing and approval for out of state placement."  [Id.].  This letter states that Brown remained in restrictive housing because he was

> identified as a validated influential member of an STG with a significant history of institutional violence and disruption as reflected in [his] disciplinary history which includes aggravated assault on another inmate (resulting in a DDU sanction), threats toward staff, participation in a STG group assault (resulting in a DDU sanction), participation in a fight that escalated into a use of force, participation in an aggravated assault in which a weapon was utilized, participation in a group demonstration, becoming a third participant in a fight. This coupled with being identified as an individual who poses a threat to a General Population warrants out of state screening.

[ECF No. 1-2 at 20].

As an initial matter, Brown's allegations that "he had not 'been into any trouble nor had incurred any disciplinary action over a year,'" [Compl. ¶ 24], that he was "no[t] []part of the [STG] responsible for the [S]taff [A]ssault upon the inmate's person," [id.], and that Defendants

"manipulate[d] Plaintiff's institutional history to justify his out of state transfer," [id. at 6, ¶ 39], all counter Defendants' assertions and are accepted as true, as they must be, for purposes of a motion to dismiss.

Moreover, as to causation, just three days after filing a grievance, he was transferred from SBCC. [Compl. ¶¶ 29–30]. When he filed an additional grievance regarding the transfer, the "Decision" on the grievance was "N/A," and the accompanying "comment" states "SMU placement due to pending investigation by SBCC." [ECF No. 1-2 at 2]. Accepting the allegations as true, and drawing inferences in Brown's favor, see Gilbert, 915 F.3d at 76, 80, he has pled enough at this stage for the Court to find that he was transferred because of the 8/21/2018 Grievance and not for some other purpose. Accordingly, Defendants' motion to dismiss Count II is DENIED.

### C. Mass. Gen. Laws ch. 12, §§ 11I, 11H (Count III)

Count III alleges a civil rights violation under Mass. Gen. Laws ch. 12, §§ 11I, 11H. [Compl. at 6, 8, ¶¶ 41–43].

The Massachusetts Civil Rights Act ("MCRA") is intended to protect all residents and visitors to Massachusetts against threats and interference with their civil rights. Mass. Gen. Laws ch. 12, §§ 11H–11J. To successfully state a claim under the MCRA, a plaintiff must show that (1) the defendant interfered with a right secured by the Constitution or laws of the United States or the Commonwealth and (2) that they did so by "threats, intimidation or coercion." Folmsbee v. Tech Tool Grinding & Supply, Inc., 630 N.E.2d 586, 588 n.3 (Mass. 1994); Mass. Gen. Laws ch. 12, §§ 11H, 11I. As the first factor has already been established here, see supra, the Court considers whether any of the alleged constitutional violations were carried out by "threats, intimidation or coercion," see Folmsbee, 630 N.E.2d at 588 n.3.

Defendants argue that "Brown does not plead any facts that amount to a violation of his rights by threats, intimidation or coercion," [ECF No. 35 at 18], and in particular that

> [f]rom what [they] can tell, the gravamen of the plaintiff's MCRA claim is that he spent 11 months in segregation as a result of defendants retaliating against him for filing a grievance. Defendants dispute this claim, but even if it were true, such retaliation was not alleged to have occurred by way of a threat, intimidation or coercion and therefore is insufficient to establish an MCRA claim.

[Id.]. Brown does not respond to this argument.

The Court agrees with Defendants that Brown's allegations under Count III focus on the alleged retaliation for filing a grievance, see [Compl. at 6, 8, ¶¶ 41–43], and that he has not alleged any threats, intimidation or coercion beyond the retaliation. Accordingly, the motion to dismiss Count III is GRANTED, and Count III is dismissed without prejudice.

### D. Qualified Immunity

Defendants finally argue that all counts against Defendants in their individual capacities should be dismissed on qualified immunity grounds. [ECF No. 35 at 19].

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Courts should follow a two-part inquiry in order to determine whether a defendant is entitled to qualified immunity." Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (citing Pearson, 555 U.S. at 232). They should "first ask 'whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right.'" Id. (quoting Pearson, 555 U.S. at 232). Second, they should "ask 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" Id. (quoting Pearson, 555 U.S. at 232)).

The question of whether a right was clearly established is also a two-part inquiry. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). "The second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." Id. (citing Wilson v. City of Boston, 421 F.3d 45, 57–58 (1st Cir. 2005)).

"The Supreme Court has emphasized 'the importance of resolving immunity questions at the earliest possible stage in litigation.' To this end, the defense sometimes can be raised and evaluated on a motion to dismiss." Haley, 657 F.3d at 47 (internal citation omitted) (first quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991); and then citing Siegert v. Gilley, 500 U.S. 226, 232–33 (1991)). That said, "[i]t is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity, and courts often evaluate qualified immunity at the summary judgment stage." Giragosian v. Bettencourt, 614 F.3d 25, 29 (1st Cir. 2010).

Defendants argue that "not only has there been no constitutional violation, . . . even if the Court were to find a violation existed, defendants rightly believed that their actions were lawful." [ECF No. 35 at 20]. Specifically, they aver that Turco "acted within [his] powers . . . when he ordered the no knock search of cells due to the belief that individuals were in possession of weapons and other contraband." [Id.]. In addition, they contend that "the actions of Silva and Ramos were reasonable" because they "believed [Brown] may have had a weapon or other contraband," and "[t]he fact that Brown did not participate in the staff assault did not preclude

22

him from still possessing a weapon or contraband in his cell." [Id.].  Thus, Defendants argue that they "reasonably believed, and the facts support, their actions to be appropriate to the situation, and [that] Brown has failed to allege any facts to support that defendants took any actions that were unreasonable." [Id.].

As explained above, Brown has sufficiently alleged a constitutional violation.  See supra. In addition, it is clearly established law that "[u]ndue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment. The Eighth Amendment is meant to prohibit 'unnecessary and wanton infliction of pain,' which is 'repugnant to the conscience of mankind.'"  Kosilek, 774 F.3d at 82 (internal citation omitted) (quoting Estelle, 429 U.S. at 103, 105–06).

Contrary to Defendants' arguments, the allegation here is not that officers searched Brown's cell because of weapons and contraband, but that "Turco's authorization of the '[n]o knock cell entry' after [the] [S]taff [A]ssault" was meant to "t[each] a punitive lesson by a staff assault upon the inmate's person."  [Compl. ¶ 23]; see also [id. ¶ 27 (after asking why force was used against him for something that happened on the other side of the prison that "he had nothing to do with," an officer responded "that a message had to be sent to prevent future assaults against staff")].  Accepting Brown's allegations as true, see Gilbert, 915 F.3d at 76, 80, the Court finds that whether "an objectively reasonable official" in Defendants' "position would have known that his conduct violated that rule of law," Alfano, 847 F.3d at 75, requires a more robust factual record (for example, to determine whether the no-knock entry was meant to teach a lesson or actually to find weapons and contraband), see Giragosian, 614 F.3d at 29.  Accordingly, the Court finds that, at this stage of the litigation, qualified immunity does not shield Defendants from suit.

**IV.      CONCLUSION**

Accordingly, for the reasons set forth above, Defendants' motion to dismiss, [ECF No. 34], is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>.  It is granted insofar as Count I is dismissed without prejudice as to Silva and Nano, and Count III is dismissed without prejudice in its entirety.  It is otherwise denied.[5]

**SO ORDERED.**

April 29, 2024                                                 */s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

---

[5] Despite stating that they move to dismiss all counts, [ECF No. 34], Defendants do not address the merits of Counts IV (assault and battery), V (intentional infliction of emotional distress), and VI (municipal liability violation pursuant to 42 U.S.C. § 1983).  Accordingly, the Court has not addressed those claims here and the motion to dismiss them is <u>DENIED</u>.

24