UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RASHARD BROWN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-11117-ADB |
| | * | |
| DEPARTMENT OF CORRECTIONS, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Plaintiff Rashard Brown ("Plaintiff" or "Brown") initiated this action seeking monetary damages from Defendants, current and former employees of the Massachusetts Department of Corrections ("DOC"), in connection with an alleged incident at Souza-Baranowski Correctional Center ("Souza-Baranowski") in Shirley, Massachusetts involving the use of force. <u>See generally</u> [ECF No. 1 ("Complaint" or "Compl.")]. Currently before the Court is Defendants Thomas Turco III, Steven Silva, Keith Nano, and Samuel Ramos' (collectively "Defendants") motion for summary judgment. [ECF No. 75]. For the reasons stated below, the Defendants' motion is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part.

# I.    BACKGROUND

## A.    Procedural History

On July 6, 2021, Plaintiff filed his verified complaint against Defendants, [Compl.], asserting claims for violation of his civil rights under 42 U.S.C. § 1983 based on the use of excessive force and denial of medical care (Count I), [Compl. ¶¶ 34–37]; retaliation (Count II), [id. ¶¶ 38–40]; violations of Mass. Gen. Laws ch. 12, §§ 11I, 11H (Count III), [id. ¶¶ 41–43]; assault and battery (Count IV), [id. ¶¶ 44–45]; intentional infliction of emotional distress (Count V), [id. ¶¶ 46–48]; and municipal liability pursuant to 42 U.S.C. § 1983 (Count VI), [id. ¶¶ 49–50].  Defendants moved to dismiss all Counts, [ECF No. 34], and the Court dismissed Count I as to Defendants Silva and Nano, and Count III in its entirety, [ECF No. 47 at 24].

Accordingly, the following claims remain against the specified Defendants, all of which are the subject of this motion for summary judgment: Count I, violation of civil rights based on the use of excessive force and denial of medical care (Turco and Ramos); Count II, civil rights retaliation (all Defendants); Count IV, assault and battery under Massachusetts law (all Defendants); Count V, intentional infliction of emotional distress under Massachusetts law (all Defendants); and Count VI, municipal liability pursuant to 42 U.S.C. § 1983 (Turco).

Defendants filed their motion for summary judgment, [ECF Nos. 75, 77], and accompanying statement of material facts, [ECF No. 76 ("SOF")], on July 22, 2025.  Plaintiff filed his memorandum in opposition to Defendants' motion for summary judgment on September 22, 2025.  [ECF No. 84 ("Opposition" or "Opp.")].

## B.    Summary Judgment Record

A party seeking summary judgment must file, in addition to its summary judgment motion, a statement of material facts with each fact set forth in a separately numbered paragraph

followed by a supporting citation to the record.  L.R. 56.1.  When presented with a summary judgment motion, a court ordinarily considers only the facts included in the parties' statements of material facts, and each fact therein must be supported by citations to evidence in the record.  Id.; Fed. R. Civ. P. 56(c).  Local Rule 56.1 is "designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.'"  Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (quoting Calvi v. Knox Cnty., 470 F.3d 422, 427 (1st Cir. 2006)).  "Where a party opposing a motion for summary judgment fails to comply with Local Rule 56.1, the court has the discretion to decide whether to impose the sanction of deeming the moving party's factual assertions to be admitted."  Butters v. Wells Fargo Advisors, LLC, No. 10-cv-10072, 2012 WL 5959986, at *2 (D. Mass. Nov. 27, 2012) (citing Swallow v. Fetzer Vineyards, 46 F. App'x 636, 638–39 (1st Cir. 2002)).

While a plaintiff's pro se status does not relieve him of his obligations to comply with procedural rules, Ruiz Rivera v. Riley, 209 F.3d 24, 27–28 & n.2 (1st Cir. 2000), courts are "solicitous of the obstacles that pro se litigants face, and . . . hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects."  Salomon v. Mass. Housing Fin. Agency, No. 22-cv-10181, 2025 WL 1594483, at *1 (D. Mass. June 5, 2025) (quoting Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008)).

Brown's Opposition includes both a statement of facts with citations to the Complaint and a statement of undisputed facts with citations to attached exhibits, but Brown has not directly responded to Defendants' statement of material facts, as required by Local Rule 56.1.  Salomon, 2025 WL 1594483, at *1; Plourde v. Sorin Group USA, Inc., 517 F. Supp. 3d 76, 81 (D. Mass. 2021); see generally [Opp.].  Although Brown did not directly respond to Defendants' statement

3

of undisputed facts, [ECF No. 76], and is therefore not in compliance with Local Rule 56.1, in the Court's discretion, and in light of Brown's pro se status, the Court will treat as disputed any facts asserted by Defendants that are contradicted in Brown's opposition brief, exhibits, and/or the summary judgment record, including Brown's verified complaint.[1]  Facts stated in Defendants' statement of facts that are not contradicted by any of the sources referenced above are deemed admitted pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.

### C.    Background Facts

Except as otherwise noted, the following facts are not in dispute.  On September 9, 2010, Brown was sentenced to 18 to 20 years in state prison for home invasion, possession of a firearm, assault and battery by means of a dangerous weapon, and possession of a controlled substance with intent to distribute.  [SOF ¶ 2; ECF No. 76-1 ("SOF Ex. 1")].  Brown was incarcerated at DOC facility Souza-Baranowski from August 2016 until August 2018.  [SOF ¶¶ 1, 6].  While incarcerated with the DOC, Brown was a validated member of a Security Threat Group ("STG"), [SOF ¶ 4; SOF Ex. 1 at 11], and affiliated with the "Bloods" gang, [ECF No. 84-1 at 6].  During his incarceration at Souza-Baranowski, Brown acquired 34 disciplinary reports for various infractions, including multiple assaults.  [SOF ¶ 5, SOF Ex. 1 at 9–10].

Thomas Turco, III, served as the Commissioner of the DOC from April 2016 until December 2018.  [SOF ¶ 1].  Steven Silva served as the Superintendent of Souza-Baranowski from May 2016 until February 2019.  [Id.].  Keith Nano served as the Deputy Superintendent of Operations at Souza-Baranowski from August 2016 until May 2017, and he retired from the

---

[1] When a complaint is verified, as is the case here, it is appropriate for a court to consider its factual averments based on personal knowledge as the equivalent of an affidavit for purposes of summary judgment.  See Sheinkopf v. Stone, 927 F.2d 1259, 1262–63 (1st Cir. 1991).

DOC in February 2022.  [Id.].  Nano was working at a different correctional facility on August

21, 2018, and did not assist with the planning or execution of the events that took place at Souza-

Baranowski on August 21, 2018.  [Id. ¶¶ 54–55].  Samuel Ramos is a Captain with the DOC.

[Id. ¶ 1].  Ramos was the designated leader of the tactical team that entered Brown's cell (the

"Bravo Tactical Team") on August 21, 2018.  [Id. ¶¶ 23–24; ECF No. 76-5 at 3 ("SOF Ex. 5")].

### 1.    August 20, 2018 Staff Assault and August 21, 2018 Operations Order

On August 20, 2018, a group of inmates assaulted staff at Souza-Baranowski (the

"August 20 Assault").  [SOF ¶ 7; Compl. ¶ 17].  That same day, Turco approved an order (the

"Operations Order") for the execution of "no knock" warrants, interviews, and contraband

searches on August 21, 2018.  [SOF ¶ 8; SOF Ex. 5 at 1].

The Operations Order set forth the procedure for the "no knock" cell entries and searches,

including that the tactical team was to enter the cell and immediately put the inmate in restraints,

the entire search was to be videotaped, and if the use of force was necessary, officers involved in

the use of force would be required to submit appropriate reports prior to being released for the

day and the inmate would be medically screened in the unit or at health services.  [SOF ¶ 12;

SOF Ex. 5 at 4–5, 7].  Inmates in certain cells were designated ahead of time to be included on

the list of "no knock" cell entries and searches pursuant to the Operations Order.  [SOF ¶ 13;

ECF No. 76-6 ("SOF Ex. 6")].  Under the Operations Order, force was only to be used if the

inmate was not compliant with being placed in restraints by the tactical team, and therefore, the

practices and procedures utilized during a planned use of force were not applicable to the "no

knock" cell entries on August 21, 2018.  [SOF ¶¶ 15–16; SOF Ex. 5].

The Operations Order states that its mission was for the "Department's Tactical Response Teams[,] Extraction Team, Special Reaction Team, K9 and Office of Investigative Services to assist the Superintendent of the Souza Baranowski Correctional Center in executing the movement of STG identified inmates," and to conduct a "systematic search of the Souza Baranowski Correctional Center" pursuant to DOC policy 103 DOC 561, titled "Planned Institutional Searches Conducted by Special Operations Response Unit" ("103 DOC 561"). [SOF ¶ 9; SOF Ex. 5 at 1]. Brown disputes the validity of this "mission," and claims that the "no knock" entries and searches were instead conducted to send a punitive message to any Black STG members that staff assaults would not be tolerated, even to those members who were not involved in the August 20 Assault. [Compl. ¶ 35].

Prior to August 21, 2018, Brown had interacted with teams of officers that assisted with moving non-compliant inmates ("Move Teams"). [SOF ¶ 17–18; ECF No. 76-8 ("SOF Ex. 10") at 33–34]. In Brown's experience, Move Teams consistently followed the procedure of first ordering the inmate to "cuff up," and if the inmate did not comply, the team might use OC spray or force to restrain the individual. [SOF ¶¶ 17, 19–20; SOF Ex. 10 at 33–34]. Under DOC policy, if a Move Team uses force, medical and mental health workers will visit the inmate afterwards. [SOF ¶ 42; Compl. ¶ 28]. Unlike the typical Move Team procedures, under the Operations Order, the tactical teams were to use a "no-knock" procedure when entering cells in order to establish a tactical advantage, [SOF ¶ 14; ECF 76-2 ("SOF Ex. 2") at 14], and medical and mental health visits were only necessary if force was used, [SOF ¶ 12; SOF Ex. 5 at 7].

On August 21, 2018, during the "no knock" cell entries and searches, Brown was aware that teams were entering cells and extracting individuals. [SOF ¶ 25; SOF Ex. 10 at 30]. He heard inmates shouting that the Move Team was back in the unit, and he had already stood up

and started to walk to his cell door when Ramos and the Bravo Tactical Team opened the door and entered.  [SOF ¶ 26; SOF Ex. 10 at 52].  When the Bravo Tactical Team opened Brown's cell door, they commanded him to get on the ground.  [SOF ¶ 27; SOF Ex. 10 at 79].  Brown turned around, away from the door, and attempted to comply with the Bravo Tactical Team's directives.  [SOF ¶ 27; Compl. ¶ 26].  Brown's cell contained only a few feet of open space, and when officers brought him to the ground to restrain him, he hit his head on his bedframe.  [SOF ¶¶ 28, 30; Compl. ¶ 26].  While Brown does not directly contest Defendants' claim that the officers did not specifically intend to hit Brown's head on the bedframe, [SOF ¶ 31; ECF No. 76-9 ("SOF Ex. 11") at 14], he does allege that the Bravo Tactical Team came into his cell "with a lot of aggression" and "slammed" him to the ground, [SOF Ex. 11 at 14].  Defendants assert that while restraining Brown, there was an officer with a knee on Brown's back, an officer near Brown's thighs, and an officer near Brown's arm.  [SOF ¶ 32].  Brown disputes this, claiming that an officer also placed a knee on his neck, obstructing his ability to breathe.  [SOF Ex. 10 at 84; Compl. ¶ 37].  Brown complied with being restrained and handcuffed and did not resist the officers' efforts.  [SOF ¶ 29; SOF Ex. 10 at 88–90].  While he was being restrained, Brown stated that he was not resisting, but not that he was having trouble breathing.  [SOF ¶ 33; SOF Ex. 10 at 88–90].  Brown was picked up as soon as he was secured.  [SOF ¶ 34; SOF Ex. 10 at 90].  In the video of the "no knock" entry, Brown is not clearly visible from the point at which officers entered his cell until after he is fully picked up.  [SOF Ex. 8 at 1:08–2:29].[2]

After being removed from his cell, Brown was escorted off the unit and taken to the non-contact visiting area for a strip search and interview.  [SOF ¶ 36; SOF Ex. 10 at 92–95].  Brown

---

[2] The Court notes that SOF Exhibit 8 is a video file that has not been stamped with a CM ECF number.

alleges that at this time the side of his head was swollen and painful from hitting it on the bedframe. [Compl. ¶ 37; SOF Ex. 11 at 57–58]. Brown informed the officers who interviewed him that his head was hurting, but did not inform members of the tactical team who removed him from his cell. [SOF ¶ 38; SOF Ex. 11 at 57–60]. Brown claims that when he told the interviewer that his head was hurting, the officer responded that "y'all shouldn't be attacking COs." [SOF Ex. 11 at 57–58]. During the August 21, 2018 cell searches, weapons and other contraband were recovered from other inmates' cells, but no contraband was recovered from Brown's cell. [SOF ¶¶ 49–50; SOF Ex. 6 at 2].

Brown asked to be seen by medical and mental health during his interview on August 21, 2018. [Compl. ¶ 28; SOF Ex. 10 at 102]. He also asked to speak with mental health after he returned to his cell, and an officer told Brown that he would call mental health, but because the unit was locked down, mental health personnel never came. [SOF ¶ 45; SOF Ex. 10 at 104]. Brown also allegedly asked a nurse during medical rounds the following day about receiving a mental health visit, and the nurse told him that she would inform mental health. [SOF Ex. 11 at 63, 68]. Brown did not receive a visit from mental health or medical. [Id.].

## 2.    August 22, 2018 Grievance

Brown submitted a grievance against the Bravo Tactical Team members for use of excessive force and denial of medical treatment on August 22, 2018 (the "August 22 Grievance").[3] [SOF ¶ 60; ECF No. 1-2 at 1]. The August 22 Grievance was received by the

---

[3] Defendants claim that it is unclear from the face of Brown's first grievance whether he signed and dated it on August 22, 2018 or August 27, 2018. [ECF No. 77 at 14, n.2]. They contend that because the grievance was received by the MCI Norfolk grievance coordinator, and Brown was transferred to MCI Norfolk on August 24, 2018, that his grievance was likely signed on August 27, 2018. [Id.]. Viewing the evidence in the light most flattering to Brown, the Court will proceed as if Brown signed the grievance August 22, 2018, not August 27, 2018.

Massachusetts Correctional Institution at Norfolk ("MCI Norfolk") facility on September 4, 2018, referred to the Superintendent, and then assigned to the DOC internal affairs unit for investigation.  [SOF ¶¶ 60, 62; SOF Ex. 2 at 2–3].  Investigator Christopher Weagle interviewed Brown and Ramos, viewed handheld video footage, and reviewed Brown's grievance.  [SOF ¶ 63; SOF Ex. 2 at 3].  The investigation found that the "no knock" entry of Brown's cell followed the protocols outlined in the Operations Order, that Brown was compliant when being restrained and extracted from his cell, and that there was no force used against Brown, and it concluded, overall, that there was no merit to Brown's allegation of staff assault and misconduct.  [SOF ¶ 64–65; SOF Ex. 2 at 1].

### 3.    Brown's Transfer to MCI Norfolk and Out of State Placement Review

Brown was transferred from Souza-Baranowski to restrictive housing at MCI Norfolk on August 24, 2018.  [SOF ¶ 59; Compl. ¶ 31].  He was then reviewed for out of state placement.  [SOF ¶ 66; SOF Ex. 1].  Brown's review for out of state placement was conducted by the DOC Classification Board and ultimately decided by the Central Classification Department.  [SOF ¶ 67; ECF No. 76-11 ("SOF Ex. 14")].  According to Defendants, the Classification Board voted that Brown was appropriate for out of state placement due to "being a validated and influential member of a [STG], having a long history of institutional violence and disruption, having been disciplined for aggravated assault on another inmate, participating in [STG] fights, assaulting an inmate with a weapon, and overall failure to comply with basic institutional rules and regulations."  [SOF ¶ 69; SOF Ex. 14].  Brown disputes this reasoning, claiming instead that he was transferred to MCI Norfolk and reviewed for out of state placement in retaliation for filing the August 22 Grievance.  [Compl. ¶ 30–31].  Brown alleges that Defendants Turco, Silva, and

Nano manipulated his institutional history to justify characterizing him as a present threat warranting transfer. [Id.]. On August 29, 2018, Brown filed a second grievance (the "August 29 Grievance") alleging that he was transferred to MCI Norfolk "for no reason." [ECF No. 1-2 at 2]. Brown's August 29 Grievance was received by MCI Norfolk on August 31, 2018, and it was denied on September 4, 2018. [SOF ¶ 61; ECF No. 1-2 at 2].

On July 18, 2019, Brown was re-classified to MCI Concord and no longer considered for out of state transfer. [SOF ¶ 71, SOF Ex. 1 at 18]. Brown continued to acquire disciplinary reports, including fighting another inmate, and was returned to Souza-Baranowski in May 2023. [SOF ¶ 72; SOF Ex. 1 at 20]. Brown remained at Souza-Baranowski until he was released in May 2025. [SOF ¶ 74].

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. When reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Id. The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which [the non-moving party] relies must be both genuine and material." Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012). The Court may discount "conclusory allegations, improbable inferences, and

unsupported speculation." <u>Cochran</u>, 328 F.3d at 6 (quoting <u>Medina-Munoz v. R.J. Reynolds</u> <u>Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." <u>Ocasio-Hernandez v. Fortuno-Burset</u>, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" <u>Id.</u> at 4–5 (quoting <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . ." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323–24 (1986). Once the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." <u>Nansamba v. N. Shore Med. Ctr., Inc.</u>, 727 F.3d 33, 40 (1st Cir. 2013).

## III.    DISCUSSION

### A.    Intentional Tort Claims (Counts IV, V) and Claims against Defendant Nano

In his Opposition, Brown agrees that his intentional tort claims (Counts IV, V) against all Defendants should be dismissed. [Opp. at 20]. Brown also agrees that all claims against Defendant Nano should be dismissed. [<u>Id.</u>]. As such, Counts IV and V are dismissed in their entirety, and Brown's retaliation claim (Count II) against Nano is also dismissed.

### B.    Eighth Amendment Excessive Use of Force Claim (Count I)

In Count I, Brown brings a claim under 42 U.S.C. § 1983 for violations of his Eighth Amendment rights based on Defendants' alleged use of excessive force when extracting him from his cell on August 21, 2018.  See [Compl. ¶¶ 34–37].

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393–94 (1989) (internal quotation marks and citations omitted).  The statute "supplies a private right of action against a person who, under color of state law, deprives another of 'any rights, privileges, or immunities secured by the Constitution and [federal] laws.'"  Gray v. Cummings, 917 F.3d 1, 7–8 (1st Cir. 2019) (quoting 42 U.S.C. § 1983).  To maintain a cause of action under § 1983, a plaintiff must show that "the challenged conduct [is] attributable to a person acting under color of state law" and that "the conduct . . . worked a denial of rights secured by the Constitution or by federal law."  Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).

The Eighth Amendment requires prison officials to "provide humane conditions of confinement[,] . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates.'"  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)).  "Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment.  The Eighth Amendment is meant to prohibit 'unnecessary and wanton infliction of pain,' which is 'repugnant to the conscience of mankind.'"  Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (quoting Estelle v. Gamble, 429 U.S. 97, 103, 105–06 (1976)).

### 1.    Subjective and Objective Prongs

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." Staples v. Gerry, 923 F.3d 7, 13 (1st Cir. 2019) (quoting Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009)). Regarding the objective prong, the plaintiff must show that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). "'[D]e minimus uses of physical force' cannot constitute Eighth Amendment violations, but 'there is no requirement of serious injury.'" De Armas v. Alves, 723 F. Supp. 3d 104, 112 (D. Mass. 2024) (quoting Mullen v. Dep't of Corr., 643 F. Supp. 3d 238, 247 (D. Mass. 2022)). The subjective prong of an Eighth Amendment use of force claim "turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Staples, 923 F.3d at 13 (quoting Whitley v. Albers, 475 U.S. 312, 320–21 (1986)). Yet, "not . . . every malevolent touch by a prison guard gives rise to a federal cause of action," McMillian, 503 U.S. at 9, and "de minimus uses of physical force" are not prohibited, provided that they are "not of a sort 'repugnant to the conscience of mankind,'" id. at 9–10 (quoting Whitley, 475 U.S. at 327). Factors considered when evaluating the subjective prong include "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials, the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and any efforts made to temper the severity of a forceful response.'" Staples, 923 F.3d at 13 (quoting Whitley, 475 U.S. at 321).

Defendants contend that Brown cannot meet either the objective or subjective prong required to prove that Defendants used excessive force against him in violation of his Eighth Amendment rights.  [ECF No. 77 at 4].

Regarding the objective prong, Brown claims that he hit his head on his bed frame as the Bravo Tactical Team members aggressively "slammed" him to the ground in his cell, resulting in swelling and pain, and that an officer then placed a knee on his neck, obstructing his ability to breathe.  [SOF Ex. 11 at 13–14, 57–59].  While Defendants do not dispute that Brown hit his head on the bedframe during the "no knock" entry, [id. at 14; SOF ¶ 31], they argue that they did not use force against Brown when extracting him from his cell, [ECF No. 77 at 4].  In support of their position, Defendants claim that an officer placed a knee on Brown's back, not his neck, and that while he was being restrained, Brown stated only that he was not resisting, not that he could not breathe.  [SOF ¶¶ 32–33, 40].  Defendants claim that during the 40–50 seconds that officers were inside Brown's cell, Brown can be heard making comments until he was picked up, and he did not appear to have lost consciousness.  [SOF ¶ 35; SOF Ex. 8 at 1:08–2:29].

Defendants also argue that the Bravo Tactical Team was operating under direct orders outlined in the Operations Order when restraining Brown.  [SOF ¶ 8].  They contend that the Operations Order was drafted and enacted consistent with 103 DOC 561, which states that "routine application of restraints and non-physical confrontational escorts shall not be considered as a use of force," [ECF No. 77 at 4; ECF No. 76-7 ("SOF Ex. 9") at 8], and that pursuant to the Operations Order, if an inmate was compliant no force was to be used, [ECF No. 77 at 5].  They acknowledge that it was never necessary to use force against Brown, claim that he was not subjected to force, and maintain that Brown believes that he was subject to the use of force

simply because, without provocation, he was placed in restraints by officers immediately upon their entry to his cell, instead of being given the opportunity to "cuff up." [Id. at 6–7].

The Court finds that there are disputes of material fact as to the objective prong of Brown's excessive use of force claim. What force was applied to Brown, including the cause and extent of his head injury and whether an officer obstructed his breathing, is a question for the jury. Video footage of the "no knock" entry into Brown's cell is inconclusive, see [SOF Ex. 8 at 1:08–2:29], and the fact that the Operations Order specified that force was only to be used in instances of non-compliance does not bear on the question of whether force was actually used against Brown.

As to the subjective prong, Defendants argue that even if force was used against Brown, it was not excessive or done with an intent to harm, reiterating that Brown's head impact was inadvertent, he was speaking clearly while officers were inside his cell, and he was brought to his feet immediately after being placed in restraints. [ECF No. 77 at 6–7; SOF ¶¶ 30–35; SOF Ex. 8 at 1:08–2:29]. The Bravo Tactical Team was, according to Defendants, strictly following the directives set out in the Operations Order, and the "no knock" tactic was necessary to eliminate the opportunity for inmates to destroy contraband. [ECF No. 77 at 6–7].

Brown contends that Defendants' actions were overly forceful and intended to send a message to inmates. [SOF Ex. 11 at 57–59]. He points to emails where DOC officials discuss inmate gang affiliations at Souza-Baranowski in support of his allegation that he was targeted for a "no knock" entry and search due to his gang affiliation, despite Defendants' knowledge that he was not involved in the August 20 Assault. [Opp. at 6; ECF Nos. 84-4, 84-5]. Additionally, Brown claims that Paul Henderson's request to have K9s on site indicates that Defendants were looking to intimidate inmates, [Opp. at 11; ECF No. 84-3], and claims that during his interview

on August 21, 2018, an officer responded to his complaints of head pain by stating "y'all shouldn't be attacking COs."  [SOF Ex. 11 at 58].

Considering the Staples factors, and viewing the facts in the light most flattering to Brown, there is a dispute of material fact as to whether the amount of force applied to Brown during the "no knock" entry of his cell was excessive or part of a good faith effort to maintain discipline at the facility.  Particularly given the lack of clear video evidence, a reasonable fact finder could conclude that the level of force used against Brown was incommensurate with the amount required, given his full and undisputed compliance with the Bravo Tactical Team's orders.

## 2.    Respondeat Superior

In addition to arguing that no excessive force was used against Brown, Defendants contend that they cannot be held liable under a theory of respondeat superior because Brown has not set forth specific factual allegations supporting liability on the part of both Turco and Ramos.

"[A] supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority."  Guadalupe-Báez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016).  A claim for supervisory liability under section 1983 "has two elements: first, the plaintiff must show that one of the supervisor's subordinates abridged the plaintiff's constitutional rights," and second, "the plaintiff must show that the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference."  Id. at 514–15 (quotations and alterations omitted).  Material factual issues remain in dispute as to whether

Turco and Ramos were linked to the alleged use of force in a manner that could be characterized as "supervisory encouragement, condonation, or acquiescence or gross negligence." Id. at 515.

While it has been established that Ramos led the Bravo Tactical Team that entered Brown's cell and restrained him on August 21, 2018, [SOF ¶ 51; SOF Ex. 6], it remains unclear whether Ramos himself was one of the officers who directly restrained Brown, [SOF ¶ 52], or if not, whether Ramos encouraged or acquiesced in the alleged use of force by other members of his team. Regarding Turco's involvement, it is undisputed that he authorized the "no knock" entries into the cells of Brown and other inmates and the use of full tactical gear and K9s. [SOF ¶ 8; SOF Ex. 5 at 7]. Brown contends that Turco knew that officers on tactical teams would be "emotionally charged" from the August 20 Assault, heightening the chance that improper force would be used against inmates, and that Turco aimed to incite a situation in which inmates would be "taught a punitive lesson." [Opp. at 3]. Viewing these facts in the light most favorable to Brown, there remains a dispute of material fact as to whether Ramos or Turco, either directly or through their supervisory actions, condoned or encouraged the use of excessive force against Brown by members of the Bravo Tactical Team.

### C.    Eighth Amendment: Denial of Medical Attention

As part of Count I, Brown also alleges that Defendants violated his Eighth Amendment rights when they denied him medical and mental health care after the "no knock" entry on August 21, 2018. See [Compl. ¶¶ 34–37].

The Eighth Amendment protects prisoners from "deliberate indifference to serious medical needs," Feeney v. Corr Med. Servs., Inc., 464 F.3d 158, 161–62 (1st Cir. 2006) (quoting Estelle, 429 U.S. at 105–06), and such a violation arises when medical care is "so inadequate as to shock the conscience," id. at 162 (quoting Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir.

1991)).  "In order to succeed [o]n an Eighth Amendment claim based on denied or inadequate medical care, a prisoner must satisfy: '(1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need.'"  Spencer v. City of Boston, No. 13-cv-11528, 2015 WL 6870044, at *7 (D. Mass. Nov. 6, 2015) (quoting Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014)) (further citations omitted).

As to the objective component, a plaintiff must show a "deprivation" that is "objectively, sufficiently serious."  Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (quoting Burrell v. Hampshire Cnty., 307 F.3d 1, 8 (1st Cir. 2002)).  For purposes of the Eighth Amendment, a medical need is "serious" if it "has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Kosilek, 774 F.3d at 82 (quoting Gaudreault v. Mun. of Salem, 923 F.2d 203, 208 (1st Cir. 1990)).  "For the subjective inquiry, the Supreme Court has specified that deliberate indifference requires that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'"  Leavitt, 645 F.3d at 497 (quoting Farmer, 511 U.S. at 837).  Deliberate indifference refers to "'a narrow band of conduct,' and requires evidence that the failure in treatment was purposeful."  Kosilek, 774 F.3d at 83 (quoting Feeney, 464 F.3d at 162).  This could include the "denial of needed medical treatment in order to punish," id. (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)), or recklessness "not in the tort law sense but in the appreciably stricter criminal law sense, requiring actual knowledge of impending harm, easily preventable," DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991).

The record shows that Brown hit his head on his bed frame while being restrained in his cell, [SOF ¶ 30], and Brown claims that one side of his head was swollen and painful, [Compl. ¶ 37; SOF Ex. 11 at 57–59].  Brown also alleges that his breathing was impeded and he almost lost consciousness due to an officer's knee being placed on his neck.  [Compl. ¶ 37].  Brown requested medical treatment during his interview on August 21, 2018, [SOF ¶¶ 38, 47], as well as a mental health visit when he was back on his unit, but did not receive either visit, [SOF ¶ 45].  Brown claims that because his requests for medical and mental health visits were ignored, it can be inferred that Defendants were attempting to cover up his injuries, though he cites no evidence supporting this proposition.  [Opp. at 16].

Even if Brown's version of events was determined to be accurate, his alleged injuries do not satisfy the objective component of his Eighth Amendment claim.  The First Circuit has held that "cuts, bruises, swelling, and some bleeding, absent, for example, any underlying conditions or future complications, are not the type of wounds that have been typically viewed as constituting a serious medical need."  Abernathy v. Anderson, 984 F.3d 1, 9 (1st Cir. 2020); see Montes v. Ponce Mun., 79 F. App'x 448, 450 (1st Cir. 2003) (finding no serious medical need where inmate was active and had only swelling and bruising).  Eighth Amendment violations require "'a condition of urgency' that may result in 'degeneration' or 'extreme pain,'" Abernathy, 984 F.3d at 9 (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)), and it is clear from both Brown's own description and the video evidence that his injuries were not sufficiently serious to meet the Eighth Amendment's requirements.  Further, Brown bases his claim, at least in part, on the theory that he should have received medical care in accordance with DOC's use of force policies, which mandate medical visits after a use of force incident, but the Eighth Amendment is not the proper vehicle to challenge noncompliance with policy where his

injuries were not sufficiently severe.  [ECF No. 84 at 15]; see Brock v. Wright, 315 F.3d 158,

162 (2d Cir. 2003) (finding that plaintiff must meet both objective and subjective prongs when

constitutionality of department of corrections policy was at issue).

Likewise, the record also does not support the subjective component of Brown's claim.

Other than his bare allegations that Defendants denied him medical care to cover up their

improper use of force, Brown cites no evidence supporting his claims that Defendants' denial of

medical treatment was purposeful or intended to punish him.  To the contrary, the record

indicates that a mental health professional could not visit Brown immediately because the unit

was on lockdown, and that Brown had access to a nurse the following day if he felt he still

needed medical care.  Accordingly, the Court will grant summary judgment as to the denial of

medical care portion of Count I.

### D.      Retaliation in Violation of Constitutional Rights (Count II)

In Count II, Brown brings a claim under 42 U.S.C. § 1983 for retaliation based on

Defendants' decision to transfer him to MCI Norfolk and review him for out of state placement.

See [Compl. ¶¶ 38–40].

"To survive summary judgment on a retaliation claim, Plaintiff must demonstrate (1) that

he engaged in protected activity, (2) that prison officials took an adverse action against him, and

(3) that there is a causal link between the protected activity and the adverse action."  Audette v.

Carrillo, No. 15-cv-13280, 2019 WL 108880, at *7 (D. Mass. Jan. 4, 2019) (citing Hannon v.

Beard, 645 F.3d 45, 48 (1st Cir. 2011)).  "Because prisoner retaliation claims are 'easily

fabricated[] and . . . pose a substantial risk of unwarranted judicial intrusion into matters of

general prison administration,' courts must insist that such claims are bound up in facts, not in

the gossamer strands of speculation and surmise."  Id.  When bringing a retaliation claim,

plaintiff must "furnish a factual basis … to support a reasonable inference of a retaliatory animus." Hannon, 645 F.3d at 50.  While circumstantial evidence, such as the timing of events, may support a reasonable inference of retaliatory conduct, Audette, 2019 WL 108880, at *7, if a defendant presents "a legitimate reason for the action and the plaintiff provides no evidence to dispute it, a court will not 'speculate about a hidden motive' at the summary judgment stage," Lopes v. Riendeau, No. 14-cv-10679, 2017 WL 1098812, at *8 (D. Mass. Mar. 23, 2017) (quoting Hannon, 645 F.3d at 51).

In his Complaint, Brown bases his retaliation claim on the theory that Defendants transferred him to restrictive housing at MCI Norfolk and reviewed him for out of state placement in retaliation for filing his August 22 Grievance.  [Compl. ¶¶ 38–39].  Defendants do not dispute that Brown's filing of his August 22 Grievance qualifies as engaging in a protected activity, see Hannon, 645 F.3d at 48, and a reasonable juror could find that placement in restrictive housing constitutes an adverse action.  Brown, however, fails to show a causal link between his protected act and Defendants' adverse action.  Brown filed his grievance on August 22, 2018, but it was not received by the MCI Norfolk facility until September 4, 2018, and by that date, he had already been transferred to MCI Norfolk.  [SOF ¶¶ 60, 62; SOF Ex. 2]. Moreover, inmate grievances are first received by the DOC grievance coordinator, see [ECF No. 77 at 14 (citing 103 Mass. Code Regs. 491.14)], and individuals named in the grievance do not participate in its processing, investigation, or resolution, see [id. (citing 103 Mass. Code Regs. 491.15)].  Nothing in the record indicates that any of the Defendants reviewed Brown's August 22 Grievance, and other than his general timing assertion, Brown has provided no evidence of a causal link between the August 22 Grievance and his transfer to restrictive housing at MCI Norfolk.

Similarly, there is little to no support that Defendants played any role in Brown's consideration for out of state placement.  Brown's review for out of state placement was conducted by the DOC classification board and central classification, which is a separate process from inmate grievance reviews.  [SOF ¶ 67; SOF Ex. 14].  Brown has provided no evidence that any of the Defendants were involved in his classification decision, and Defendants have put forth ample evidence that Brown's disciplinary history was the basis for his out of state transfer review and decision.  Accordingly, Brown has failed to show any causal link between his filing of the August 22 Grievance and his consideration for out of state transfer.

In his Opposition, Brown does not address these deficiencies in his claim; instead he appears to allege a new theory that Defendants retaliated against him by adding him to the list of "no knock" entries and searches on August 21, 2018, due to his gang affiliation.  [Compl. at ¶¶ 38–40].  "It is well-settled that plaintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.'"  Ellis v. North Andover Public Schs., 569 F. Supp. 3d 61, 65 (D. Mass. 2021) (quoting Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 76 (1st Cir. 2016)).  In order to bring a new claim that arises out of discovery, a plaintiff must amend the complaint as required by Fed. R. Civ. P. 15(a), because "[t]o do otherwise would subject defendants to unfair surprise at a late stage in the litigation."  Id.  Therefore, Brown's new theory of liability related to his retaliation claim is not appropriately before the Court.

Accordingly, for the reasons explained above, Defendants' motion for summary judgment is granted as to Count II.

### E.    Municipal Liability Violation (Claim VI)

In Count VI, Brown brings a claim under 42 U.S.C. § 1983 against Defendant Turco, claiming that Turco knew that issuing the Operations Order would result in the use of excessive force in violation of DOC's use of force policies set forth in 103 Mass. Code Regs. 505.  [Compl. ¶¶ 49–50].

Defendants argue that 103 Mass. Code Regs. 505 does not afford incarcerated individuals a private right of action, so Brown is not entitled to money damages for purported violations of 103 Mass. Code Regs. 505.  They also contend that Defendant Turco issued the Order pursuant to 103 DOC 561 not 103 Mass. Code Regs. 505.

Generally, "a private cause of action cannot be inferred solely from an agency regulation."  Loffredo v. Ctr. for Addictive Behavs., 689 N.E.2d 799, 803 (1998).  In his Opposition, Brown does not specifically address Count VI, and he has not provided, in either his Complaint or his Opposition, any authority indicating that a violation of either 103 Mass. Code Regs. 505 or 103 DOC 561 creates a private right of action.  The Court is also not aware of any such authority.  See Ainooson v. O'Gara, No. 23-cv-11478, 2024 WL 4349240, at *13 (D. Mass. Sept. 30, 2024) (finding that plaintiff could not bring § 1983 claim where DOC regulation did not authorize a private right of action).  To the extent that Brown claims that Turco's actions in connection with the Operations Order violated his Eighth Amendment rights, these allegations are encompassed by his claims in Count I.  Accordingly, the Court grants Defendants' motion for summary judgment as to Count VI.

### F.    Qualified Immunity

Defendants argue that Brown's § 1983 claims against Defendants in their individual capacities should be dismissed on qualified immunity grounds.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "Courts should follow a two-part inquiry in order to determine whether a defendant is entitled to qualified immunity." Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (citing Pearson, 555 U.S. at 232).  They should "first ask 'whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right,'" and second, they should "ask 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" Id. (quoting Pearson, 555 U.S. at 232)).  Whether a right was clearly established is also a two-part inquiry.  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).  "The second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." Id. (citing Wilson v. City of Boston, 421 F.3d 45, 57–58 (1st Cir. 2005)).

Defendants contend that they did not violate Brown's constitutional rights, but even if they had, they rightly believed that their actions were lawful.  With respect to Count I, they claim that Turco "acted within the powers granted to him by the legislature when he approved the August 20, 2018 order" because the Operations Order "specifically state[d] that the mission was to search STG inmates for contraband" and specified that the searches were to be conducted pursuant to 103 DOC 561.  [ECF No. 77 at 24–25].  They claim that Brown was placed on the

24

"no knock" entries list due to his STG membership and institutional history, not to target or punish him.  [Id. at 25].  Defendants also argue that there is "no basis to believe that Ramos believed he was in violation of any civil rights when he executed the searches as directed in the August 20, 2018 order."  [Id.].

It is well established law that "the Eighth Amendment protects inmates against uses of force that '[do] not further any sort of disciplinary or safety rationale and merely inflicted pain.'" Mullen v. Dep't of Corr. of Mass., 800 F. Supp. 3d 250, 265–66 (D. Mass. 2025) (quoting Mullen, 643 F. Supp. 3d at 248); Kosilek, 774 F.3d at 82 ("Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment" which "is meant to prohibit 'unnecessary and wanton infliction of pain,' which is 'repugnant to the conscience of mankind.'") (quoting Estelle, 429 U.S. at 103, 105–06).  As explained above, there remains a dispute of material fact as to the amount of force used against Brown and whether this force was necessary.  "[T]he Court can wait until after the facts have been settled to determine whether the officer's conduct was objectively reasonable and falls under the qualified immunity umbrella." Clergeau v. Mass. Dep't of Corr., 714 F. Supp. 3d 8, 21 (D. Mass. 2024) (holding that defendants would not be entitled to qualified immunity if it was found that officers continued to use force against inmate well after they were aware that force was no longer needed) (citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)).  Because these material facts remain in dispute, the Court is unable to determine at this stage whether Defendants are entitled to qualified immunity.

## IV.    CONCLUSION

Accordingly, the Defendants' motion for summary judgment, [ECF No. 75], is **GRANTED** in part and **DENIED** in part.  Summary judgment is allowed with respect to Counts

II, IV, V, and VI in their entirety and Count I insofar as it concerns Plaintiff's alleged denial of medical care.  Accordingly, those claims are dismissed.  Summary judgment is denied with respect to Plaintiff's claims in Count I against Defendants Turco and Ramos for the use of excessive force in violation of Plaintiff's Eighth Amendment rights.

**SO ORDERED.**

February 6, 2026                                      /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE